UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VICTOR DELEON,

    Plaintiff,

v.                                            Case No. 05-CV-70187-DT

CITY OF ECORSE, LARRY SALISBURY, in his
individual and official capacities, and GEORGE
ANTHONY, current Police Chief, in his official
capacity,

    Defendants.
                                             /

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' "MOTION FOR SUMMARY JUDGMENT"**

Pending before the court is Defendants' "Motion for Summary Judgment." This motion has been fully briefed and the court held a hearing on Defendants' motion on October 12, 2005. For the reasons stated below, the court will grant in part and deny in part Defendants' motion.

**I. BACKGROUND**

Plaintiff Victor Deleon originally filed his Complaint against Defendants City of Ecorse, Ecorse Mayor Larry Salisbury, and Ecorse Police Chief George Anthony on December 22, 2004 in the Wayne County Third Circuit Court. Defendants timely filed a notice of removal pursuant to 28 U.S.C. § 1441 in this court on January 18, 2005, on the basis of the federal question involved in this case.

Plaintiff volunteered for the U.S. Marines in January 1965 and served two tours of duty in Vietnam before his honorable discharge in December 1968. (Pl.'s Dep. at 7-

9.) After his military career ended, Plaintiff worked odd jobs until he was hired by the Ecorse Police Department in 1975. (*Id.* at 10.) Prior to his retirement, Plaintiff was a police officer in the City of Ecorse for nearly thirty years (more than 17 years as a patrolman and 12 years as a Sergeant). (*Id.* at 11-14.) Before the end of his employment with the Ecorse Police Department on April 6, 2004, Plaintiff was the lead Sergeant in charge of the Ecorse Detective Bureau. (*Id.* at 18-19.)

In November 2003, the City of Ecorse elected a new mayor, Defendant Larry Salisbury. Salisbury and the City Council appointed a new city attorney, Andrew Robertson, who implemented new criminal prosecution procedures in the Ecorse Police Department. (*Id.* at 21-32.)

On or about March 3, 2004, Plaintiff approached Robertson in the detective bureau in an attempt to submit some paperwork that he believed to be in compliance with Robertson's new criminal prosecution procedures. (*Id.* at pp. 41-48.) Robertson, however, rejected Plaintiff's paperwork as being inadequate according to the new procedures. Plaintiff was immediately angered by Robertson's response. (*Id.* at 48.) Plaintiff snatched the paperwork from Robertson and slammed it on the desk where Robertson was sitting and pushed some other papers off of the desk. (*Id.* at 48-49.) At the same time, Plaintiff used obscene language in reference to Robertson. (*Id.* at 49-50.) Plaintiff also admitted that he shoved the chair that Robertson was sitting on. (*Id.* at 48-55.) No further actions or words were exchanged between the two men for the rest of the day. (*Id.*)

Robertson filed a departmental complaint relating to Plaintiff's action. On March 15, 2004, former Ecorse police chief Robert Shaw issued a notice that a chief's hearing

on this matter would be conducted on March 17, 2004. (Pl.'s Resp. at Ex. G.) Mr. Robertson, Lamar Tidwell (Plaintiff's union representative), and other witnesses participated in Plaintiff's hearing. (Pl.'s Dep. at 63-64; Tidwell Dep. at 10-11.) Shaw did not announce his decision at the hearing. Plaintiff testified that at the end of the hearing Shaw "may have said something like, well, we'll be in touch, or something like that," (Pl.'s Dep. at 65), and Tidwell testified that "[a]t the end of the hearing . . . [b]asically [Shaw] just said he would get back with us or whatever." (Tidwell Dep. at 11.) The police chief testified that at the end of the hearing he had concluded that Plaintiff should be disciplined for 60 days: 30 days of suspension and 30 days in probation. (Shaw Dep. at 15.) Nonetheless, at a meeting among the police chief, Robertson, and John Clark, labor litigation counsel for Defendants, the police chief received a discharge memorandum for Plaintiff that was written by John Clark. (*Id.* at 22-25.) After this meeting, Shaw presented to Plaintiff, through Tidwell, the options of voluntary retirement or termination from his current employment. (Shaw Dep. at 22-25; Tidwell Dep. at 19; Pl.'s Dep. at 67.)

On April 6, 2004, Plaintiff requested in writing two weeks to make the decision. (Pl.'s Resp. at Ex. H.) Plaintiff submitted his retirement letter on that same day. (*Id.*) On or about May 25, 2004 and again on October 25, 2004, Plaintiff, through his attorney, requested a hearing from Mayor Salisbury under the Michigan Veterans Preference Act ("MVPA"), M.C.L. § 35.401 et. seq. (*Id.* at Ex. I.) Plaintiff's requests received no response from Salisbury. (Salisbury Dep. at 24.)

In his Complaint, Plaintiff claims that Defendants violated his Procedural Due Process rights as guaranteed by the Fourteenth Amendment and deprived Plaintiff's

3

property interest in employment, which was created by MVPA and his labor union's Collective Bargaining Agreement ("CBA"). (Pl.'s Compl. at 4-9.)

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.  *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'").  A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486,492 (6th Cir. 2004) ("[W]e must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'") The court does not weigh the evidence to determine the truth of the matter, but must determine if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## III.  DISCUSSION

### A.  Constructive Discharge

As an initial matter, Defendants argue that Plaintiff's "entire claim is without basis" because Plaintiff was not terminated from his employment nor forced to retire, but instead voluntarily retired and, therefore, no process was owed to him. (Def.'s Mot. at 12-13.) Plaintiff, on the other hand, contends that his retirement was not voluntary, and that he was constructively discharged. (Pl.'s Resp. at 8.)

The Sixth Circuit Court of Appeals has devised a two-pronged test for evaluating claims of constructive discharge. *Yates v. Avco Corp.*, 819 F.2d 630 (6th Cir. 1987). The test requires an inquiry into the objectively-assessed impression an employee would receive and the intent of the employer. *Id.* at 636. More specifically, to demonstrate a constructive discharge, the plaintiff must produce evidence showing that "(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and (2) the employer did so with the intention of forcing the

5

employee to quit." *Logan v. Denny's,* 259 F.3d 558, 568-69 (6th Cir. 2001) (internal citations and quotations omitted).  In determining whether a reasonable person would have felt compelled to resign due to working conditions, the inquiry should focus on seven relevant factors: "(1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) reassignment to work under a younger supervisor, (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Logan*, 259 F.3d at 558 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000).)

The present case, however, presents a situation that does not involve an allegation of a deliberate creation of "intolerable" working conditions by Plaintiff's employer.  Plaintiff was given the option of voluntary retirement to avoid involuntary termination.  (Pl.'s Dep. at 67-68; Shaw Dep. at 25; Tidwell Dep. at 19.)  The two-pronged test created in *Yates* is not applicable as Plaintiff did not choose to resign in light of an intolerable working environment or some such discriminatory allegation.

Irrespective of the absence of allegations of an unbearable work environment, however, the core of "[w]hat distinguishes early retirement from discharge is the power of the employee to choose to keep working."  *Henn v. Nat'l Geographic Society*, 819 F.2d 824, 828 (7th Cir. 1987).

Viewing the evidence of Plaintiff's "choice," including Plaintiff's, Shaw's, and Tidwell's deposition testimony, in a light most favorable to Plaintiff (and which Defendants in fact do not dispute), Plaintiff was told to either declare his retirement or

6

be discharged. A reasonable jury could conclude that Plaintiff's employer had no intention of retaining Plaintiff after the alleged incident and that Plaintiff, therefore, did not have the power to choose to keep working. (Shaw Dep. at 25; Tidwell Dep. at 19.) The court construes Plaintiff's retirement as a constructive discharge and proceeds with its analysis of Defendants' motion.

### B. Liability of the City of Ecorse under 42 U.S.C. § 1983

Defendants argue that even assuming that Plaintiff was constructively discharged, Plaintiff cannot establish that Defendant City of Ecorse was municipally liable under 42 U.S.C. § 1983 because Plaintiff has not identified a policy or custom implemented by the City of Ecorse that is the cause of his alleged injury. (Defs.' Mot. at 13, 25.)

A municipal corporation cannot be liable for actions of its employees under a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). A municipality, however, may be directly liable for unconstitutional action taken pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers . . . [or] for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690-91.

Moreover, a single unconstitutional act cannot establish *Monell* liability unless there is also proof of some policy or custom that can be attributed to an official policymaker. *Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985). Although a custom is generally a permanent and well-settled practice, *Doe v. Clairborne County*, 103 F.3d 495, 506 (6th Cir. 1996), *Monell* liability can be based on a single decision by an official

7

policymaker as long as that official has "final authority to establish . . . policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-81 (1986). Exercise of authority, however, does not make one a final policymaker unless that exercise is unreviewable and unconstrained by superiors. *City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988). Imposing liability for such conduct would amount to finding liability based on *respondeat superior*. *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (citing *Prapotnik*, 485 U.S. at 126.).

Plaintiff has not pointed to any City of Ecorse custom or policy that was intended to or did have the effect of depriving Plaintiff of his right to due process. Plaintiff argues, however, that Defendant Larry Salisbury, as mayor, was a final decision maker relating to the termination of his employment, and is the conduit by which the City may be held liable under *Monell*. (Pl.'s Resp. at 5-6.)

Mayor Salisbury's own testimony, however, suggests that he was not the *final* decision maker relating to the question of Plaintiff's option to retire or be terminated. On the issue, the mayor testified as follows:

> Q: Okay. Do you remember any conversations with Shaw [regarding Plaintiff]?
> A: No, not specifically. Just in general there was this.
>
> Q: Okay. In general what do you recall talking about?
> A: Just that it happened.
>
> Q: Okay. How about with Tidwell?
> A: The only conversation I recall ever having with Tidwell, and it may have been a disconnected conversation like two phone calls on the same conversation or even three phone calls as part of the same conversation, was - - *to my surprise* there was a call from Tidwell saying that Mr. DeLeon had been given notice to terminate, if I'm not mistaken, or was going to get notice.

Q: Okay.

***

A: And he wanted a few days to decide whether or not he would want to wrestle that issue or retire.

***

Q: What was your conversation with Tidwell? What did you say to Tidwell?
A: I think he was asking for my opinion- - -

Q: Okay.
A: - - - on what I thought of the idea, and I think I remember saying to him - - I'm pretty sure I said to him the - - the few days, I don't know how you treat that. You're either working or you're not working. You're either retired or you're not retired. I don't know how to treat it. What do you mean you need a few days?

***

Q: Okay.
A: And if they were asking me to make the decision, I wasn't going to make the decision, that's the chief's call, and I don't think he was asking me that.

(*Id.* at 5-8 (emphasis added).) Mayor Salisbury is obviously describing a situation in which he was reacting to information that Tidwell was providing him. In fact, Mayor Salisbury began his testimony relating to his conversation with Tidwell by stating that he was "surprise[d]" by the information that Tidwell relayed to him. (*Id.* at 6.) Moreover, Tidwell stated in his deposition that "everything that was said [relating to the termination of Plaintiff's employment] was coming from Shaw." (Tidwell Dep. at 19.) By the mayor's own statement and Plaintiff's union representative's statement, Mayor Salisbury was not the ultimate decision maker in the case. Shaw was. Moreover, the CBA negotiated between the City of Ecorse and the Police Officers Association of Michigan allows for the "Chief of Police to attempt to settle [a police officer's] dispute" if the Union

9

filed a grievance and provides for a "Chief's hearing." (CBA at 4-6; 8, Pl.'s Resp. at Ex. E.) Plaintiff has not presented evidence to controvert the assertion that Mayor Salisbury was not the final decision maker in this matter. *Monell* liability, therefore, cannot be imposed on the City of Ecorse based on Salisbury's actions connected with Plaintiff's constructive discharge.

Additionally, Plaintiff argues that "Shaw's decision was also ratified by the final group of persons employed by the City of Ecorse eligible to review Shaw's decision [-] the grievance procedure." (Pl.'s Resp. at 7.) Plaintiff asserts that "Step II of the [CBA] authorized City Attorney Robertson and Controller Hollenquest to make this decision," (*id*), but presents in support only Mayor Salisbury's testimony that he didn't recognize the handwriting on the Step II grievance "but it might be Earl Hollenquest." (Salisbury Dep. at 26-27.) The CBA itself, however, provides for Step III (filing a dispute with the American Arbitration Association or the Federal Mediation Conciliation Service) after the completion of Step II. (CBA at 5, Pl.'s Resp. at Ex. E.) Plaintiff, therefore, has neither established nor even created a triable issue of fact that Robertson or Hollenquest was a final decisionmaker for the City of Ecorse. Defendant's motion on the issue of Defendant City of Ecorse's municipal liability will be granted.

### C. Qualified Immunity

Defendants further argue that even assuming that Plaintiff was constructively discharged, Mayor Salisbury was not involved, and is entitled to qualified immunity in his individual capacity.

Generally, public officials performing discretionary functions are entitled to qualified immunity and are protected from defending a § 1983 action when their conduct

does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), established a two-part inquiry relating to qualified immunity. First, a court must decide whether the alleged facts, taken in the light most favorable to the injured party, establish the violation of a constitutional right. *Id.* at 201. If no constitutional right is implicated, "there is no necessity for further inquiries concerning qualified immunity." *Id.* If, however, a constitutional right is implicated, the next inquiry is "whether the right was clearly established." *Id.* This examination "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* Furthermore, "the contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*; *see Wilson v. Layne,* 526 U.S. 603, 615 (1999). It is not necessary, however, "that the very actions have been previously held unlawful but, given the preexisting law, the

unlawfulness of the conduct must have been apparent." *Barton v. Narrod*, 106 F.3d 1289, 1293 (6th Cir. 1997) (citation omitted).  "[R]easonable mistakes can be made as to the legal constraints on particular [official] conduct.  It is sometimes difficult for an [official] to determine how the relevant legal doctrine . . . will apply to the factual situation the [official] confronts.  An [official] might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular [course of action] is legal in those circumstances.  *If the [official's] mistake as to what the law requires is reasonable, however, the [official] is entitled to the immunity defense*."  *Saucier,* 533 U.S. at 205 (emphasis added).

The court agrees that "the facts are unrefuted that Mayor Salisbury was not involved in the decision to terminate Plaintiff."  (Defs.' Mot. at 16.)  Mayor Salisbury stated without contradiction that he did not make the decision to give Plaintiff the option of termination or voluntary retirement.  Plaintiff contends in response only that Salisbury failed to accord Plaintiff an MVPA hearing.  This claim, however, is the basis for Plaintiff's action against the mayor in his official capacity.  No constitutional right of Plaintiff's is implicated in the non-participation of Salisbury in the decision-making of the Chief.  At a minimum, an objectively reasonable person in the position of Salisbury could have thought that his course of action, i.e., not interfering with or participating in the Chief's disciplinary hearing for Deleon, was proper.  Defendants' motion on the liability of Salisbury in his individual capacity will be granted.

### D.  Procedural Due Process Claim

Plaintiff argues that he was deprived of his right to procedural due process by not

being afforded a hearing under the MVPA.

"[A]n employer cannot deprive an employee of a legitimate claim of entitlement to continued employment without due process." *Patrick v. Miller,* 953 F.2d 1240, 1244 (10th Cir. 1992) (citing *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)). The essence of procedural due process is fair play; hence, the fundamental due process requirement "is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal citations omitted).

### 1. Michigan's Creation of a Property Interest

"Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

The MVPA "was enacted for the purpose of discharging, in a measure, the debt of gratitude the public owes to veterans who have served in the armed services in time of war, by granting them a preference in original employment and retention thereof in public service." *Valentine v. McDonald*, 123 N.W.2d 227, 230 (Mich. 1963). "The act entitles a veteran to notice and a hearing before his employer may take any action against him with respect to his employment. The act converts at-will public employment positions into ones that are terminable only for just cause." *Sherrod v. City of Detroit*, 625 N.W.2d 437, 441-42 (Mich. Ct. App. 2001) (citing *Jackson v. Detroit Police Chief*, 506 N.W.2d 251 (Mich. Ct. App. 1993)). Therefore, as a matter of law, the MVPA created Plaintiff's property interest in his employment.

13

The CBA between the parties is also a source of Plaintiff's property interest in his employment. Pursuant to the CBA between the parties, the police department agreed to "act in a fair, consistent and equitable manner and any punishment will be related to the offense committed with due regard to circumstances of case and for the employees past record." (CBA at 7, Pl.'s Mot. at Ex. E.) The limits on the circumstances under which Plaintiff's employment could be terminated, therefore, created a property interest in Plaintiff's employment. *Leary v. Daeschner*, 228 F.3d 729, 742 (6th Cir. 2000) (holding that "[a] contract, such as a collective bargaining agreement, may create a property interest").)

### 2. Alleged Violation

#### a. Robertson's Alleged Participation in Discussions that Ended With Shaw's Decision to Terminate Plaintiff

Plaintiff contends that "Robertson's participation in the decisionmaking process did not comply with Due Process." (Pl.'s Resp. at 10.) He complains that the decision to terminate was "accomplished by a process other than the actual decision of Shaw, the proper decisionmaker." (Pl.'s Resp. at 13.)

It is well-established that an adjudicator cannot have been "the target of personal abuse or criticism from the party before him." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). More specifically, the *Withrow* Court held that:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if

14

the guarantee of due process is to be adequately implemented.
*Id.* In addition, the *Royal v. Ecorse Police and Fire Comm.*, 75 N.W.2d 841 (Mich. 1956) court held that a person who determines the outcome of a matter cannot also act as a witness (holding that the "plaintiff did not receive a fair and impartial trial because of the fact that the only two witnesses who testified against plaintiff also sat in judgment as to his guilt or innocence."). *Id.* at 845.  Moreover, "bias and partiality become very real problems if the tribunal has been the target of criticism or abuse from those coming before it.  Certainly, a body that has prejudged the outcome cannot render a decision that comports with due process." *Bakalis v. Golembeski*, 35 F.3d 318, 326 (7th Cir. 1994).

In support of his position, Plaintiff cites *Taylor v. Hayes*, 418 U.S. 488, 501-02 (1974), which found a violation of due process when a judge adjudicated contempt proceedings when he had "become embroiled in [the] running controversy."  Plaintiff also points to *Patrick*, 953 F.2d at 1245-46, in which a city's Personnel Director, who served as a hearing officer during the plaintiff's pretermination hearing, testified that he "was given a prepared memorandum finding that [the plaintiff] should be terminated [and] felt coerced into Patrick's termination because he thought his own job might be jeopardized by finding in [the plaintiff's] favor."  A reasonable jury, however, could not find that Robertson was the final decisionmaker in this case.  To that end, a reasonable jury could not find that Shaw participated in the prosecutorial aspects of the matter and was also a decisionmaker in the adjudicative stages of the process or that he was heavily involved in the underlying matter.

When viewing the evidence in a light most favorable to Plaintiff, the undisputed

15

evidence establishes that Shaw, not Robertson, was the final decisionmaker. Any theories of the case or positions that Shaw may have adopted before making his final decision do not diminish the fact that he acted as the decisionmaker in this matter. Shaw stated explicitly and without contradiction that the decision to terminate Plaintiff was not forced upon him. (Shaw Dep. 23-24.) Defendants' motion, therefore, is granted on Plaintiff's claim of a violation of procedural due process based on prosecutorial persons being, or influencing, the adjudicators.

### b. Notice of Potential Termination Prior to Hearing

Plaintiff also complains that the notice of Shaw's hearing did not specify that termination was a possibility, and Plaintiff therefore suffered a violation of his due process rights. Plaintiff cites language from *Cotnoir v. Univ. of Maine Systems*, 35 F.3d 6 (1st Cir. 1994) which states that:

> Providing notice of both the charges against an employee, and the proposed action based on those charges is necessary, because "[e]ven where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect."

*Id.* at 11 (citing *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985)). The *Cotnoir* court noted, however, that despite the fact that a person involved in the hearing knew that another individual had recommended termination, and "that this action was *clearly being contemplated*, the individual defendants never provided [the plaintiff] with any notice of this proposed action." *Id.* at 12 (emphasis added.). In the instant case, Plaintiff has not presented evidence that Plaintiff's termination was contemplated at the time that Shaw convened the hearing. Moreover, although the *Cotnoir* court held that

"[w]hen the Supreme Court decided *Loudermill*, it clearly contemplated that when an individual is faced with the potential loss of a protected interest, officials must provide the individual with notice of the charges alleged against him *and* any proposed action the officials intend to take, based on those charges," the *Loudermill* court did not explicitly make this statement. *Id.* at 11 (emphasis supplied.).[1] The *Loudermill* court held that due process requires "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. . . . To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Loudermill*, 470 U.S. at 546.[2] Defendants' motion is granted on this issue.

### E. Hearing Conducted Under The MVPA

Plaintiff also complains that he did not receive a hearing with regard to his MVPA property interest. Under the MVPA, the ability to terminate is much more limited than is the case with "at will" employment. Termination is possible only for "habitual, serious or

---

[1] While persuasive, opinions of First Circuit are not binding on this court. *Ashki v. I.N.S.*, 233 F.3d 913, 921 (6th Cir. 2000) ("[W]e are not bound by the holdings of our sister circuits.").

[2] The court finds that, contrary to the First Circuit's opinion, *Loudermill* does not require notice of the disciplinary action contemplated. Moreover, even the *Cotnoir* court only required such notice when the disciplinary action was "clearly being contemplated." There is simply no evidence that prior to the chief's hearing or even prior to the meeting with Clark and Robertson, Shaw was clearly contemplating terminating Plaintiff.

willful neglect in the performance of duty, extortion, conviction of intoxication, conviction of felony, or incompetency." M.C.L. § 35.402. Pursuant to M.C.L. § 35.402:

> No veteran . . . holding an office or employment in any public department or public works of the state or any county, city or township or village of the state . . . shall be removed or suspended, or shall, without his consent, be transferred from such office or employment except for official misconduct, habitual, serious or willful neglect in the performance of duty, extortion, conviction of intoxication, conviction of felony, or incompetency; and such veteran shall not be removed, transferred or suspended for any cause above enumerated from any office or employment, except after a full hearing before . . . the mayor of any city or the president of any village, or before the commission of any such city or village operating under a commission form of government, if an employee of a city or village, . . . and at such hearing the veteran shall have the right to be present and be represented by counsel and defend himself against such charges: Provided further, That as a condition precedent to the removal, transfer, or suspension of such veteran, he shall be entitled to a notice in writing stating the cause or causes of removal, transfer, or suspension at least 15 days prior to the hearing above provided for, and such removal, suspension or transfer shall be made only upon written order of . . . the mayor.

M.C.L. § 35.402. The only veterans employed by state and local governments who are not protected by the MVPA are "department heads, members of commissions and boards, heads of institutions appointed by the governor, officers appointed by a city's mayor under the city's charter, and first deputies of such people." *Jackson*, 506 N.W.2d at 252. Plaintiff was neither appointed by the mayor nor a first deputy of the police chief. Consequently, the exceptions to MVPA coverage do not apply to Plaintiff and, as a covered employee, he is entitled to the protections the MVPA provides.

The MVPA also requires veterans to file a written notice of protest within 30 days of suspension or termination from employment. M.C.L. § 35.402. Defendants argue that Plaintiff's request for an MVPA hearing was untimely because his first request was not made until May 25, 2004 and he was constructively discharged on April 6, 2004.

(Defs.' Mot. at 17.)  In *Glover v. Kalamazoo,* 296 N.W.2d 280 (Mich. Ct. App. 1980), however, the Michigan Court of Appeals found a demand for a MVPA hearing to be sufficiently timely where a police officer was suspended without pay because a criminal perjury charge was instituted against him, and the officer first demanded an MVPA hearing long after his suspension and after the criminal charge against him had been dismissed.  *Id.* at 282 ("[T]he time limitation for protesting suspension . . . was tolled by the criminal proceeding pending plaintiff at the time he was suspended.").  In the instant case, the criminal proceedings against Plaintiff did not conclude until December 17, 2004, (Pl.'s Resp. at Ex. Q), and Plaintiff's notice demanding an MVPA hearing was made within the period while the criminal charges were pending, and therefore appears to be timely.

The parties agree that Plaintiff did have a Chief's hearing before his "discharge," and agree as well that Plaintiff had no MVPA hearing.  It is clear that only a mayor can be the final decisionmaker pursuant to the MVPA, not a chief of police.  Plaintiff's argument that Shaw did not make the "final" decision relating to Plaintiff's employment is rendered irrelevant, as it was not his decision to make under the MVPA.  Because it is undisputed that Plaintiff did not have a hearing before Mayor Salisbury, pursuant to the MVPA, a reasonable jury could find that Plaintiff's right to a hearing under the MVPA was violated.  Defendants' motion as to Plaintiff's claim of a due process violation based on the failure to provide an MVPA hearing will be denied.

### F.  Grounds for Termination

Plaintiff also argues that under the MVPA, "there is no basis for discharge unless there was a finding of 'official misconduct, habitual, serious[,] or willful neglect in the

performance of duty, extortion, conviction of intoxication, conviction of felony or incompetency.'" (Pl.'s Resp. at 16 ) (citing M.C.L. § 35.402). Plaintiff correctly cites the MVPA standard, but has not identified -- and the court has not independently located -- evidence that Plaintiff's violent, indeed criminal, conduct while on duty was anything less than "serious neglect" in the performance of his duty. The uncontroverted evidence shows that Plaintiff intentionally used physical violence during his official interaction with the city's attorney. It remains true, however, that Plaintiff did not receive an MVPA hearing as required by law. Defendants' motion relating to Plaintiff's MVPA procedural due process claim will be denied.

## IV.  CONCLUSION

IT IS ORDERED that Defendants' Motion for Summary Judgment [Dkt. # 14] is GRANTED IN PART AND DENIED IN PART. Defendants' motion is granted as to the alleged individual-capacity liability of Salisbury and liability of the City of Ecorse. The motion is denied as to the alleged official-capacity liability of the Mayor for failure to provide procedural due process related to the demanded MVPA hearing.

          S/Robert H. Cleland
          ROBERT H. CLELAND
          UNITED STATES DISTRICT JUDGE

Dated: January 11, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, January 11, 2006 by electronic and/or ordinary mail.

          S/Lisa Wagner
          Case Manager and Deputy Clerk
          (313) 234-5522